## UNITED STATES v. LAI SEE.

District Court, S. D. New York.
April 21, 1934.

Martin Conboy, U. S. Atty., of New York City, and Irvin Rutter, Asst. U. S. Atty., of New York City, for the United States.

Edward A. Welti, of New York City (Herbert S. Siegal, of New York City, of counsel), for defendant.

CAFFEY, District Judge.

According to his testimony, the defendant is about 34 years of age. According to

that testimony he was born either in 1899 or in 1900. It is stated by the witnesses that he left San Francisco soon after the earthquake. That would mean that he left there in approximately 1906 or 1907. It is said by the witnesses also that he came to New York immediately from San Francisco and has continuously resided here since. It is further stated by these witnesses, with a single exception mentioned later, that the information they have concerning the defendant came exclusively from a cousin of the defendant; that this cousin left New York for China in 1919; and that it was later reported from China that the cousin had died there.

If the defendant was born in 1899 or 1900 and came to New York immediately following the earthquake, then (1) at the time of his arrival here, he was from 6 to 8 years of age; (2) at the time his cousin went back to China, he was 19 or 20 years of age. The results are also that (1) at the time of the death of his parents in the San Francisco earthquake he was 6 or 7 years of age; (2) he resided in New York where he was in contact with his cousin from the time he was 6 or 8 years old until he was 19 or 20.

One witness, Wong Ding, testifies that he lived next door to the parents of the defendant in San Francisco and recalls that the defendant was born there. The only other witness, Moy Pone, has no information about the place of birth of the defendant save that he says that he heard a statement made by the cousin of the defendant during his lifetime, at some time prior to his leaving New York in 1919, that the defendant was born in San Francisco.

It is unbelievable that a child 6 or 7 years of age at the time of the death of his parents, and particularly when they died as they did under such tragic circumstances as in the earthquake, and more especially a youth who thereafter had available to him as a continuous associate a cousin until he himself was of the age of 19 or 20, should have been without information concerning his parents to such extent that he did not even know their names, or their relationships, or that he did not remember anything about San Francisco where he claims he was born. It is unbelievable.

It is understandable, when an official of the government, such as a Chinese inspector, interviews a Chinaman through an interpreter, that not everything he answers should be wholly consistent. I should not charge it against the defendant if in a number of respects there were inconsistencies between the statement first made to the inspector and the later statements, particularly if the inconsistencies were in minor respects or as to minor matters. When, however, there are disclaimers on the part of the defendant so numerous as they are in this case of having any knowledge of the matters inquired about, such as concerning his parents and their relations and the circumstances out in San Francisco, it then becomes of significance that he makes those disclaimers.

If there were nothing else in the case but the testimony as given by the defendant himself before the inspector and in advance of a time when he had had opportunity to prepare what his answers would be, there would be enough to create a very strong doubt as to the truthfulness of his testimony. That doubt is not removed by anything testified by either of the witnesses who were produced and have testified on the stand today. On the contrary, there are a great many respects in which neither of those witnesses testified satisfactorily.

It must be borne in mind that it is inherently difficult for the government to produce witnesses who can testify specifically with respect to Chinese who are in the country. This is familiar knowledge to the courts. Indeed, it is familiar knowledge to anybody who has had any dealings with the problems of getting at the truth in regard to the coming and other circumstances affecting the residence of Chinese in the country. For that reason the Congress of the United States had made a rule as to proof on the subject. This rule is that a person of Chinese descent who is in this country must satisfy the authorities, including the court, as to his right to be here.

On the ground stated also the answers given by a Chinese when first inquired of become of very great significance. In the nature of things when such inquiries are first made, there has probably not been opportunity to prepare for the answers; there has not then been anticipation of just what the inquiries will be at a later stage or where they will lead after the elapse of weeks or months subsequent to the arrest and in advance of a hearing held before the United States Commissioner or before the court.

Prior to a hearing such as has been in progress today, there has occurred opportunity to shape up a statement and to make the effort to bring it into accord with what testimony other witnesses in the meantime can have been procured to give.

For the reason particularly that there are vital conflicts in so many respects between the testimony given by the defendant to the inspector in August, 1933, when he was first

examined, and the subsequent testimony given by himself and by his witnesses, I do not believe the testimony that the defendant was born in the United States. I feel bound to say that the testimony has been insufficient to satisfy me that he was born in the United States.

The result is that the decision of the United States Commissioner must be affirmed and an appropriate order may be taken for the deportation of the defendant from the United States.